UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| DENNY L. REED | Case No. 17-cv-22<br>Black, J.<br>Bowman, M.J. |
| Plaintiff,<br>v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

Plaintiff Denny Reed filed this Social Security appeal in order to challenge the Defendant's denial of his disability claim after remand from this Court. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error. For the reasons explained below, I conclude that the ALJ's finding of non-disability is supported by substantial evidence and should be AFFIRMED.

**I. Summary of Administrative Record**

The instant appeal represents Plaintiff's second appearance before this Court. He initially filed an application for Disability Insurance Benefits ("DIB") on March 9, 2011, alleging disability primarily due to a back impairment, beginning on December 23, 2008. After his claim was denied through the administrative process, including after an evidentiary hearing and written decision by an administrative law judge ("ALJ") in 2013, Plaintiff appealed to this Court. On September 15, 2015, the undersigned reversed the ALJ's 2013 decision, and remanded for further review of the evidence under sentence

four of the Social Security Act. (Tr. 507-517). Following remand from this Court, the Appeals Counsel vacated the prior decision and reassigned the case to a new ALJ.[1]

A new evidentiary hearing was held on July 12, 2016 before ALJ Jeffrey Hartranft, at which Plaintiff, a medical expert, and a vocational expert all gave testimony. (Tr. 524-581). On September 16, 2016, ALJ Hartranft issued a new adverse decision. (Tr. 467-479). Plaintiff did not seek further Appeals Council review of this second adverse DIB decision but instead, timely filed this appeal to obtain additional federal judicial review. (Tr. 465).

Plaintiff was 36 years old on the date of his alleged disability, and was 38 years old on December 31, 2010, when he was last insured for purposes of DIB. (Tr. 478). He had a high school education and past relevant skilled work as a welder, an auto services manager, a drywaller, a salesman, mechanic, autobody repair, and mobile home utility worker, as well as additional work as a material handler and airport utility worker at the semi-skilled level, and unskilled work as a lumbar handler. (*Id.*)

The ALJ determined that Plaintiff suffered from severe impairments of lumbar degenerative disc disease; status post burst fracture at L3, with fusion at L2-4 and diabetes mellitus. (Tr. 470). However, the ALJ determined that Plaintiff did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 471). Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of sedentary work with the following restrictions:

---

[1]The Appeals Council initially directed the ALJ to consolidate the remanded DIB case with a much later filed SSI case. (Tr. 505). Although the ALJ heard testimony concerning the time periods of both claims, he ultimately issued separate opinions, finding consolidation to be improper due to the widely disparate time periods involved. Plaintiff does not contest the continued division of the two claims.

> [H]e was able to stand and walk for 15 minutes at a time, for a total of two hours in an eight-hour day. He could sit for one hour at a time, then needed to get up briefly, which could be combined with the usual breaks or other workplace tasks, but as a result he would be off task five percent of the workday in addition to the usual breaks. He could occasionally stoop, kneel, crouch, crawl and climb ramps and stairs, but should not climb ladders, ropes or scaffolds. He could frequently balance. He should avoid workplace hazards such as unprotected heights and machinery. He was unable to operate foot controls with the right lower extremity.

(Tr. 472).

There is no dispute that Plaintiff cannot perform any of his past work. However, based on the testimony of a vocational expert, the ALJ determined that Plaintiff would have been able to perform a substantial number of jobs in the national economy, including the representative unskilled occupations of assembler, inspector, and sorter, prior to the date that he was last insured. (Tr. 479). Therefore, the ALJ concluded that Plaintiff was not under a disability. (*Id.*)

Plaintiff argues that the ALJ erred when he: (1) failed to find that Plaintiff's spine disorder met the criteria of Listing 1.04A; and (2) improperly credited the opinions of the medical expert over the opinions of his treating physicians. I find no error.

**II. Analysis**

**A. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

3

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

Whether considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts

4

to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

### B. Plaintiff's Claims

#### 1. Listing 1.04A:  Disorders of the Spine

Plaintiff's first claim is that the ALJ erred in failing to find that his spine injury met Listing 1.04A at Step 3 of the sequential analysis, entitling him to a presumption of disability. The prior remand of this case was based on the same claim.

To meet or equal the Listing, Plaintiff was required to show that he had a disorder of the spine, lasting more than twelve months, that resulted in a compromise of a nerve root or his spinal cord, with additional evidence showing

> nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpt P, App. 1, § 1.04A.  An impairment meets a listed impairment only when it manifests the specific findings described in the set of medical criteria for that particular listed impairment. 20 C.F.R. § 416.925(d).  It is a claimant's burden at the third step of the evaluation process to provide evidence that he meets or equals a listed

impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987).

It is well-settled that a claimant's impairments must satisfy each and every element of the relevant listing. *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 Fed. Appx. 3, 6 (6th Cir.2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing."). An ALJ must compare the available medical evidence with the requirements for listed impairments to determine whether a claimant's condition is equivalent to a listing. *Reynolds v. Com'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *2 (6th Cir. Apr.1, 2011). Thus, for Plaintiff to have been found disabled at Step 3 in this case, he must have had (1) a spinal disorder that (2) resulted in "compromise of a nerve root" with (3) "neuro-anatomic distribution of pain," (4) "limitation of motion of the spine," and (5) motor loss (muscle weakness) accompanied by (6) sensory or reflex loss. *See also Moore v. Com'r of Soc. Sec.*, Case No. 1:16-cv-825, 2017 WL 3727231 (S.D. Ohio Aug. 9, 2017)(affirming ALJ finding that plaintiff did not meet Listing 1.04A in light of several records indicating intact sensation and/or normal reflexes, and lack of sensory deficits).

In the earlier 2013 decision that this Court remanded, the previous ALJ provided only one sentence to explain why Plaintiff did not meet Listing 1.04A, stating that "the record fails to document compromise of the nerve root and a gait abnormality of the severity described in section 1.00B2.b." (Tr. 513). The prior ALJ included no analysis of relevant evidence. Plaintiff argued then, as he does now, that the ALJ's cursory

6

conclusion that an examining orthopedist, Dr. Bender, had not opined that Plaintiff met the Listing failed to consider the specific findings contained in Dr. Bender's report. Rejecting the Commissioner's argument that this Court should still affirm based on the existence of substantial evidence to support the ALJ's conclusion, the undersigned reversed because the ALJ's "one sentence analysis that the record did not show evidence of nerve root compression prevents the Court from conducting any meaningful judicial review." (Tr. 515).

In his 2015 opinion on remand, ALJ Hartranft relied heavily on testimony from a medical expert ("ME"), orthopedist Dr. Kendrick, to conclude that Plaintiff did not meet the Listing at Step 3. While his Step 3 discussion remains relatively brief, ALJ Hartranft did provide additional analysis to support his conclusion that "there is little to no medical evidence in the record to support" that Plaintiff's impairment meets or equals Listing 1.04A. (Tr. 471).

> [Dr. Kendrick] testified that the claimant did not meet listing 1.04A prior to his date last insured. Dr. Kendrick elaborated and included that there was no indication in record of motor loss prior to his date last insured [12/31/10].
>
> During a neurological evaluation in June 2010, the claimant's sensory examination was intact to touch, vibration, and position, but pinprick was slightly decreased over the right calf and foot since his previous back surgery…. His muscle tone was normal, with no atrophy…, normal muscle strength and normal gait.

(Tr. 471). Adding to this analysis, the ALJ discussed multiple medical records that supported his conclusions elsewhere in his opinion.

Plaintiff's back problems began when he sustained a fracture at L3 in an ATV accident in May 2007, after which he underwent spinal fusion of levels L2-4. He recovered well from that surgery and returned to full-time employment, with nearly

7

complete resolution of his pain and normal neurological function. (Tr. 473-474). However, in June 2008, Plaintiff was involved in a three-car collision. Immediately after that accident, Plaintiff denied any sensory or motor loss, and he had a good range of motion, despite tenderness to palpation in both cervical and lumbar spine areas. (Tr. 474). In fact, he continued to work full-time, until he was laid off in December 2008 when his employer closed its facility. (Tr. 384).

ALJ Hartranft's opinion discusses many of Plaintiff's post-2008 treatment records, including those from the Dayton Orthopaedic Surgery and Sports Medicine Center, where he was first evaluated in November 2008 after his car accident. Many if not most of those records reflect examination and treatment from a physician's assistant, Mr. Gillman, with oversight by Dr. Paley. (Tr. 474-475; *see also* Tr. 384, 386). Plaintiff's initial examination records reflect several abnormal findings of spasm and tenderness, as well as a decreased sensation to palpation into the buttocks bilaterally and down into his right posterior thigh. However, the ALJ pointed out that other findings were normal or nearly normal, and he was neurovascularly intact in both extremities. (Tr. 474). A nerve imaging study in December 2008 was "normal except for evidence of acute injury to the right S1 posterior rami distribution." (*Id.*, citing Tr. 277, which record notes "thecal sac and S1 nerve roots are intact"). During a follow-up examination, Plaintiff again had full strength and function of his lower extremities, despite a "decreased sensation to light touch and pinprick" in the LS-S1 nerve root distribution. A March 2009 MRI showed only "mild" degenerative disc disease <u>without</u> nerve root compression, despite "mild narrowing of the lateral recesses and neural foramina bilaterally from disc and osteophytes" at L4-L5. (Tr. 474, citing Tr. 275). And, as the ALJ states, a June 2010 neurological evaluation found Plaintiff's sensory exam to be

intact and normal, except for a slightly decreased pinprick sensation over the right calf and foot, with normal muscle tone and no atrophy, full muscle strength, and a normal gait including tandem and heel/toe walking. (Tr. 474-475).

The ALJ also discussed the records of Plaintiff's treating pain specialist, Dr. Donnini, to whom Plaintiff was referred in July 2010. At that time, Dr. Donnini noted Plaintiff appeared to be in no distress, but stated that his gait was "limited by pain on the right." Other than that relatively vague description, Dr. Donnini gave no indication Plaintiff was unable to ambulate adequately. Dr. Donnini found "fair to normal strength" but a "decreased sensation at the right calf and foot." (Tr. 475). Dr. Donnini's notes repeat the same description throughout his treatment. A series of nerve root injections in October-November 2010 were reported to provide some symptom relief/improvement, including a report of stable symptoms and findings shortly before and after Plaintiff's date last insured. (*Id.*)

Evaluating the evidence as a whole, the ALJ noted that

> [a]lthough he had some decreased sensation in his right calf and foot, the evidence…does not document any significant gait abnormality or need for an ambulatory aide [sic] prior to his date last insured. ...The claimant reports foot drop…; however, I take note that this symptom[] did not appear [until] more recently and was not demonstrated in the record prior to the claimant's date last insured.

(Tr. 475-476).

The ALJ relied upon a number of records that reflect no wasting or atrophy, as well as the observation of a normal gait during several examinations prior to Plaintiff's date last insured, plus mostly negative straight leg raising ("SLR") tests during the same time period, other than "some notations of positive straight leg raising on the right….".

9

(Tr. 471-472). The ALJ did not find the positive SLR tests or other intermittent findings to be determinative of Listing level severity due to the absence of

> a detailed description of gait, range of motion of the spine, given quantitatively in degrees from the vertical position (zero degrees) or, for straight leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes as required.

(*Id.* at 472).

The type of "detailed description" that the ALJ found to be lacking is set forth in 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 1.00D and 1.00E, which require "a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position" as well as positive SLR tests in <u>both</u> sitting and supine positions. The regulations also clarify that the type of motor loss required to meet the Listing is "significant," as evidenced by an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate…." *Id.* Evidence of atrophy should include "circumferential measurements of both thighs and lower legs" and be "accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength." *Id.*

Unlike the 2013 decision, ALJ Hartranft's finding that Plaintiff does not meet or equal the Listing is substantially supported. Plaintiff complains most about ALJ Hartranft's failure to explicitly reference the findings contained in Dr. Bender's report. While an explicit reference to that report may have been preferable, further remand is not required because the ALJ's analysis now permits meaningful judicial review. Although ALJ Hartranft did not discuss Dr. Bender, the ALJ gave Plaintiff free reign to question Dr. Kendrick about Dr. Bender's report and the other records on which Plaintiff

relies. Despite extensive cross-examination concerning that evidence, Dr. Kendrick opined that Plaintiff's records did not consistently and persistently (over a 12-month period prior to his date last insured) demonstrate <u>all</u> of the Listing criteria. (Tr. 552, pointing out that Plaintiff returned to work and was neurologically intact following his spinal fusion). The ALJ's reference to multiple inconsistencies in examination findings in the record as a whole, as well as his explicit reliance on Dr. Kendrick's testimony, constitutes substantial evidence sufficient to uphold his Step 3 determination.[2]

As stated, the ALJ discussed many records that reflect "normal" findings, supporting Dr. Kendrick's opinion that Plaintiff did not meet all of the Listing criteria for a continuous 12-month period. (*See* Tr. 471, 474-475, citing Tr. 311 (neurological exam of Dr. Venkatesh with mostly normal findings, including normal muscle tone, no atrophy and a normal gait, despite a pinprick sensation "slightly decreased over the right calf and foot" since his earlier surgery); Tr. 474, citing Tr. 288 (inconsistent evidence from Dr. Paley that Plaintiff had "five out of five strength with flexion of the hips bilaterally" and "full function of the knees and ankles bilaterally")). Plaintiff also reported significant pain relief from steroid injections in April, May and June 2009, which undercut his claim of pain at the severity required for the Listing. (*Id.*, citing Tr. 278-281). In July 2009, Plaintiff exhibited no tenderness or radicular symptoms. (Tr. 474, citing 291). And, despite recording some guarded range of motion, Dr. Paley's records do not contain the

---

[2]The undersigned notes that an unpublished decision in 2011 suggested that more specific analysis of medical evidence may be necessary at Step 3, see *Reynolds v. Com'r of Soc. Sec.,* 424 Fed. Appx. 411 (6th Cir. 2011). However, since 2011, the Sixth Circuit has declined to remand even when only minimal Step 3 analysis is provided by an ALJ. See *Lynch v. Com'r of Soc. Sec.*, Case No. 1:15-cv-793, 2017 WL 770995 at *4 (S.D. Ohio Feb. 8, 2017) (affirming finding that Listing 1.04A not met despite some evidence and relatively minimal Step 3 analysis, citing Sixth Circuit decisions in *Forrest v. Com'r of Soc. Sec.*, 591 Fed. Appx. 359, 364-66 (6th Cir. 2014) and *Malone v. Com'r of Soc. Sec.*, 507 Fed. Appx. 470, 472 (6th Cir. 2012) (per curiam)).

type of quantitative findings required to satisfy the Listing, nor do they state whether Plaintiff's SLR tests were conducted in both sitting and supine positions. (Tr. 288-289, 290-294, 474). *See* 20 C.F.R. Part 404, Subpt P., App'x 1 §§ 1.00E, 1.04A. Finally, just after the expiration of Plaintiff's insured status, in January 2010, Dr. Donnini also observed that Plaintiff had no atrophy or antalgia in his lower extremities, and specifically documented negative SLR testing, and a normal gait. (Tr. 349, 472, 475). Later records after Plaintiff's insured date similarly reflect no atrophy or antalgia, despite the repeated reference to a gait "limited by pain on the right" without further detail, (Tr. 472, 475; *see also* 320 325, 328, 330, 334).

This Court has previously affirmed similar decisions in which the record failed to show consistent and continuous symptoms that matched all Listing 1.04A criteria for a 12-month period. *See e.g., Irvin v. Com'r of Soc. Sec.*, Case No. 1:12-cv-837-TSB, 2013 WL 3353888 (S.D. Ohio July 3, 2013)(holding that despite evidence of positive SLR tests, reduced strength and reflexes, loss of sensation, antalgic gait, spasm, and reduced range of motion, testimony of ME that other findings were not consistent or persistent, and conclusion of ALJ that findings were not sufficiently consistent to satisfy the Listing, was supported by substantial evidence); *Gully v. Com'r of Soc. Sec.,* Case No. 1:16-cv 923, 2017 WL 4329632 (S.D. Ohio Aug. 3, 2017) (affirming where some of plaintiff's records reflected normal findings during the relevant period, including no atrophy and normal strength and tone); *Brauninger v. Com'r of Soc. Sec.*, Case No. 1:16-cv-926-TSB-SKB, 2017 WL 5020137 (S.D. Ohio Nov. 3, 2017)(Doc. 13, objections filed, R&R pending). This approach also comports with social security policy. *Accord* Social Security Acquiescence Ruling 15-1(4) (holding that outside of cases filed in the Fourth Circuit, the Commissioner would continue to apply its policy that all criteria of

listing 1.04 must be present simultaneously and continuously for at least twelve months. "[W]hen the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root compression would not rise to the level of severity required by listing 1.04A...."). SSAR 15-1(4), 80 FR 57418-02, 57420 (citing 20 C.F.R. §§ 404.1525(c)(4), 416.925(c)(4)), 2015 WL 5697481 (Sept. 23, 2015).

Plaintiff argues that on cross-examination, Dr. Kendrick agreed that Plaintiff met all of the Listing criteria. (Doc 10 at 6-13; *see* Tr. 533-534, 539-540). However, the cited testimony does not reflect that Plaintiff met <u>all</u> criteria prior to the expiration of his insured status on December 31, 2010.[3] In fact, contrary to Plaintiff's position, Dr. Kendrick confirmed that he did <u>not</u> find the existence of the requisite motor loss prior to Plaintiff's date last insured. (Tr. 531, 539-540). In addition, Dr. Kendrick clarified his testimony by explaining that evidence of motor loss and other criteria were not documented as "persisting for a 12 month period." (Tr. 534; *see also* Tr. 544 "there's a lot of inconsistencies [in] the record."; Tr. 545 "[H]e has reflex losses on some occasions, and he doesn't have it on others"; Tr. 546, agreeing to reflex loss and muscle weakness only "on occasion"; Tr. 546, 547-550, denying documentation of consistent positive SLR tests in both sitting and supine positions as required by the Listing).

---

[3]Portions of the cross-examination are somewhat ambiguous as to dates. (Tr. 540). Although the ALJ subsequently issued separate decisions for Plaintiff's DIB and SSI applications, Dr. Kendrick was asked to testify about the "full time period," spanning both the December 2008 through December 2010 period of the DIB application, and the much later period pertinent to the SSI application. (Tr. 530, explaining "we are hearing both of those [applications] today"). Dr. Kendrick initially focused on the period prior to the expiration of Plaintiff's insured DIB status, (Tr. 535), but clearly testified to the entire record. He testified that the first reappearance of mention of any foot drop was in 2015, and that there was no atrophy in 2016. (Tr. 536).

13

Dr. Kendrick testified that the very first reference to any foot drop occurred <u>after</u> Plaintiff's last insured date, was referenced only once in Dr. Bender's February 2011 report, and was not mentioned again until 2015. (Tr. 539). In the intervening years, Plaintiff had normal examinations by other people. (Tr. 535). Dr. Kendrick opined that there was no evidence that the foot drop was caused by nerve root compression, as opposed to some unrelated reason, since there are many causes for foot drop including the common cause of crossing one's legs for too long. (Tr. 531-532, 540). He explained that both foot drop and the type of muscle atrophy documented by Dr. Bender can come and go "quite suddenly." (Tr. 535-536). He further opined that it would have been possible that the Plaintiff had no atrophy prior to his date last insured but instead developed it within a few weeks of Dr. Bender's 2011 examination. When asked if the atrophy went away and came back again, Dr. Kendrick insisted: "It can." (Tr. 535). Dr. Kendrick also noted that, despite a July 2009 note documenting "severe" weakness in Plaintiff's right leg, that same weakness "apparently resolved" based upon the lack of corroborating notation in multiple subsequent records.

Plaintiff's heavy reliance on Dr. Bender's report, his citation to contrary evidence in some of the notes of Dr. Paley (Tr. 286, 293, 297) and Dr. Donnini (Tr. 389), and/or citation to imaging studies do not support reversal, because the referenced evidence does not negate the substantial evidence that supports a contrary determination that Plaintiff did not meet the Listing.[4] The ALJ explained his reasons for concluding that

---

[4] Dr. Bender conducted an independent medical examination for the defense in litigation concerning the 2008 car accident. It is worth noting that Dr. Bender's primary conclusion was that all of Plaintiff's permanent injuries were caused by the 2007 ATV accident and spinal fusion, and that Plaintiff suffered no significant additional injury from the 2008 car accident. Instead, Dr. Bender opined that he suffered only a "spine strain" in the 2008 accident that required little additional treatment. "[T]here is a credible treatment cutoff date of 9/4/08…." (Tr. 387). Dr. Bender's alleged findings regarding Listing level criteria in 2007,

14

neither the inconsistent medical records nor the imaging evidence demonstrated Listing level severity. (*See, e.g.*, Tr. 474). Dr. Kendrick provided a thorough analysis of all of the evidence, including Dr. Bender's report,[5] and the ALJ reasonably relied upon his interpretation of the evidence. The existence of substantial evidence to support a different conclusion will not support reversal, so long as substantial evidence also exists to support the ALJ's decision. In short, Plaintiff's citation to Dr. Bender's report and/or other select records fails to overcome the evidence that supports the ALJ's decision in this case.

### 2. Medical Record and Opinion Evidence

In his closely related second claim of error, Plaintiff complains that the ALJ overly relied on Dr. Kendick's opinions, and improperly rejected the opinions of two treating physicians. The ALJ noted that

> [T]here is no medical opinion of record by treating or examining practitioners to indicate that [Plaintiff] was prevented from all work activity ro more limited than assessed above, prior to his date last insured. All treating source opinions in this record are dated almost a year or more after the claimant's date last insured.

(Tr. 476).

Plaintiff first argues that the ALJ erred by giving "great weight" to the opinions of Dr. Kendrick because his opinions were not "consistent with the record." (Doc. 10 at

---

with no additional impairment in 2008, are inherently inconsistent with Plaintiff's return to full-time work after that time.

[5]Although Dr. Bender opines that Plaintiff's "spinal canal remains at least 50% compromised at L3," along with a "residual cauda equine syndrome," it is not entirely clear that Dr. Bender's reference to "compromise" of the spinal *canal* equates to the more significant nerve root <u>compression</u> required by the Listing. In his testimony in this case and in prior cases, Dr. Kendrick and courts have distinguished between "compromise" and "compression." (Tr. 546); *see, generally, Brauninger v. Com'r*, Case No. 1:16-cv-926-TSB-SKB, 2017 WL 5020137 at *5-6 (collecting cases, explaining differences between "compromise" of the spinal canal and Listing level "compression" of the nerve root versus "irritation"). In fact, Dr. Bender acknowledges that Plaintiff's March 2009 MRI scan did not show either neurological compression or involvement of the nerve root at the L4-5 level. (Tr. 387).

19). However, for the reasons discussed above, the undersigned finds substantial evidence to support Dr. Kendrick's opinions.

Plaintiff next argues that the ALJ erred by failing to give "controlling weight" to the January 5, 2012 opinion of Dr. Donnini, a treating pain specialist who opined that Plaintiff was "unable to work." The ALJ provided "good reasons" for giving "little weight" to this conclusory opinion on the ultimate issue of disability:

> Although Dr. Donnini is the claimant's primary treating pain management specialist, this conclusory statement was provided over a year after the expiration of the claimant's date last insured. It does not provide a function-by-function analysis of what the claimant could do despite his impairments, prior to his date last insured and the notes around the time of the expiration of the claimant's date last insured do not support this assertion, as discussed above. Moreover, the regulations provide that the final responsibility for deciding issues such as, whether an individual's impairments meet[] or is equivalent in severity to the requirements of any impairments in the listings; what an individual's residual functional capacity is; whether an individual's residual functional capacity prevents him from doing past relevant work; how the vocational factors of age, education, an work experienced apply; and whether an individual is "disabled" under the Act, are reserved to the Commissioner….

(Tr. 476-477). An opinion that an individual is disabled is not the type of medical opinion that is entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(1). Additionally, as the ALJ pointed out, three months after Dr. Donnini rendered his opinion that Plaintiff was unable to work, another treating pain management physician, Dr. Mubarak, opined that "[s]edentary work could be an option, but [Plaintiff] has opted not to work." (Tr. 477).

Plaintiff's criticism of the ALJ's treatment of Dr. Paley's records is similarly unavailing. Dr. Paley offered no specific RFC or disability opinions, and the ALJ explained (as did Dr. Kendrick) why Dr. Paley's records did not support Plaintiff's

16

position that he met Listing 1.04A, or greater limitations than determined by the ALJ.[6]  In contrast to the requirement that an ALJ discuss medical opinions, there is no regulation that requires an ALJ to discuss every clinical record.  *See Miller v. Colvin*, 2015 WL 3970298 (S.D. Ohio June 30, 2015).

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

                           */s Stephanie K. Bowman*
                           Stephanie K. Bowman
                           United States Magistrate Judge

---

[6]Incidentally, Dr. Bender was also very critical of Dr. Paley's records and treatment, noting the lack of any comprehensive neurological examination among other inconsistencies.  (Tr. 386).

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| DENNY L. REED | Case No. 17-cv-22<br>Black, J.<br>Bowman, M.J. |
| Plaintiff, | |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant | |

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).